[No. D042955. Fourth Dist., Div. One. May 21, 2004.]

In re S.M., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
RAY M. et al., Defendants and Appellants.

1110

COUNSEL

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant Ray M.

Susan Bookout, under appointment by the Court of Appeal, for Defendant and Appellant Lucille S.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Katharine R. Bird, Deputy County Counsel, for Plaintiff and Respondent.

Linda M. Fabian, under appointment by the Court of Appeal, for Minor.

OPINION

McDONALD, J.—Ray M. appeals a judgment terminating his parental rights to his daughter, S.M., under Welfare and Institutions Code section 366.26.[1] Ray asserts the judgment should be reversed because (1) proper notice was not provided under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.); (2) the court abused its discretion by denying his section 388 modification petition; and (3) the court did not ensure S. was able to visit her half brother, J.B. Lucille S., S.'s paternal grandmother and de facto parent, appeals from the denial of her section 388 modification petition. She raises no arguments relating to the denial of that petition, but contends that the judgment should be reversed because notice was not provided in compliance with the ICWA. Because the Agency did not comply with the notice provisions of the ICWA, we reverse the judgment terminating parental rights and direct the court to ensure proper notice under the ICWA is given.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

The San Diego County Health and Human Services Agency (the Agency) removed S. from the custody of her mother, T.D. (T.), shortly after her April 2001 birth and filed a section 300 petition on her behalf. The petition alleged S. was at risk because T. was incarcerated and Ray's whereabouts were unknown. Shortly after S. was removed from T.'s custody, Lucille told the social worker that S. looked "just like my mother; you can see the Indian in her," and there was "Cherokee blood, on my mother's side."

At the May 2001 jurisdictional and dispositional hearing, the court made a true finding on the petition. However, because T.'s five other children had previously been declared dependents and did not reunify with her, the court did not order reunification services and scheduled a section 366.26 hearing. Although not clear from this record, it appears that because Ray was an alleged father, he was not offered services. In August 2001 the court found Ray was S.'s biological father and entered a judgment of paternity.

In November 2001 Ray filed a section 388 modification petition seeking to vacate the order referring the matter to a section 366.26 hearing and to obtain services because he had been declared S.'s biological father. Later that month, the court denied his petition. At the contemporaneous section 366.26 hearing, the court terminated parental rights after finding S. was adoptable and none of the section 366.26, subdivision (c)(1) exceptions applied. Ray timely appealed.

In June 2002 we reversed the judgment terminating parental rights because Ray had not received adequate notice of the jurisdictional and dispositional hearings. (*In re S.M.* (June 18, 2002, D039069) [nonpub. opn.].) We did not address Ray's contention that notice had not been provided under the ICWA, but because there was sufficient evidence S. might be an Indian child, we directed the court to assure proper notice was given under the ICWA.

Following remand by this court, Ray told the social worker his grandmother, Lillian, may have been registered with one of the Cherokee tribes and before her death resided in Beaumont, Texas. In August 2002 the social worker sent notices to the Cherokee Indian tribes and

the Bureau of Indian Affairs (BIA). The Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians responded that, based on the information provided by the Agency, S. was not eligible for enrollment in their tribes. The Cherokee Nation of Oklahoma requested more information about S.'s family members to verify Cherokee heritage.

In late August the Agency filed an amended petition, alleging S. was at risk of harm because of her parents' drug use. At the detention hearing, the court found notice had been provided pursuant to the ICWA and the ICWA did not apply. In October the court made a true finding on one allegation in the petition, granted Lucille's de facto parent application, declared S. to be a dependent, and removed her from T.'s custody. The court denied reunification services for both parents and scheduled a section 366.26 hearing. Ray and Lucille filed petitions for extraordinary writ relief under California Rules of Court, rule 39.1B,[2] which this court denied in April 2003. (*Ray M. v. Superior Court* (Apr. 25, 2003, D041129) [nonpub. opn.].)

In July 2003 Lucille, Ray, and T. each filed a section 388 modification petition. Lucille sought a hearing to review the Agency's decision not to place S. with a paternal uncle and aunt. Ray and T. sought to vacate the section 366.26 hearing and obtain six months of services to reunify with S. T. also sought S.'s return to her custody. The next month the Agency received a letter from the Cherokee Nation of Oklahoma stating it had received no response to its previous request for information and reiterating it was unable to verify S.'s Indian heritage without further information.

In September 2003 the court denied the section 388 modification petitions. Contemporaneously, the court found S. was adoptable and none of the section 366.26, subdivision (c)(1) exceptions applied, and terminated parental rights.

## DISCUSSION

### I

Lucille[3] and Ray assert the judgment must be reversed because notice of these proceedings was not given in compliance with the ICWA.

---

[2] All rule references are to the California Rules of Court.

[3] We question whether Lucille has standing to assert violations of the ICWA. Congress has granted standing to challenge findings made in violation of the ICWA to the Indian minor, the minor's tribe, or the parent or Indian custodian from whose custody the minor was removed. (25 U.S.C. § 1914.) Of these, Lucille could only be S.'s Indian custodian. However, it is not clear she had custody within the meaning of the ICWA. (See *Matter of Adoption of a Child of Indian Heritage* (N.J. 1988) 543 A.2d 925, 937 [25 U.S.C. § 1914 refers to legal, not physical,

## A

Congress enacted the ICWA in 1978 to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C. § 1902.) It allows a tribe to intervene in state court dependency proceedings (25 U.S.C. § 1911(c)) because the "ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469 [99 Cal.Rptr.2d 688].)

■ "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and their right of intervention." (25 U.S.C. § 1912(a).) Notice to the tribe provides it the opportunity to assert its rights. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 174 [6 Cal.Rptr.3d 205].) "Notice shall be sent whenever there is reason to believe the child may be an Indian child, and for every hearing thereafter unless and until it is determined that the child is not an Indian child." (Rule 1439(f)(5).) No proceeding to terminate parental rights may occur until 10 days after the tribe has received the notice. (25 U.S.C. § 1912(a).) ■ We may void a judgment terminating parental rights if notice to the tribes or BIA is not given in accordance with provisions with the ICWA. (25 U.S.C. § 1914.)

## B

Lucille and Ray contend reversal of the judgment is required because the Agency did not include information about Lillian in the August 2002 notices it sent to the Cherokee tribes and the BIA.

■ One of the primary purposes of giving notice to the tribe is to enable it to determine whether the minor is an Indian child. (*In re D.T.*

custody of a minor].) However, because no party has raised the issue of standing, it has been waived. (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 548, fn. 1 [131 Cal.Rptr.2d 122].) We also question whether Lucille may appeal from the denial of her section 388 modification petition without raising issues related to that petition. However, we need not resolve these questions because Ray, who has standing, has also raised the issue of adequate notice under the ICWA.

(2003) 113 Cal.App.4th 1449, 1455 [5 Cal.Rptr.3d 893].) Notice is meaningless if no information or insufficient information is presented to the tribe.[4] (*D.T.,* at p. 1455.) The notice must include the name, birthdate, and birthplace of the Indian child; his or her tribal affiliation; a copy of the dependency petition; the petitioner's name; a statement of the right of the tribe to intervene in the proceeding; and information about the Indian child's biological mother, biological father, maternal and paternal grandparents and great-grandparents or Indian custodians, including maiden, married and former names or aliases, birthdates, places of birth and death, current and former addresses, tribal enrollment numbers, and/or other identifying information. (*In re Karla C., supra,* 113 Cal.App.4th at p. 175; *In re C.D.* (2003) 110 Cal.App.4th 214, 225 [1 Cal.Rptr.3d 578]; 25 C.F.R. § 23.11(a), (d).)

 The social worker has "a duty to inquire about and obtain, if possible, all of the information about a child's family history" required by 25 Code of Federal Regulations part 23.11(d)(3). (*In re C.D., supra,* 110 Cal.App.4th at p. 225.) However, the initial appellate record shows no information was provided in the ICWA notices about Lucille or Lillian, the person with alleged Indian heritage. Information about Lucille was indisputably available because she was the minor's de facto parent. (See *In re Jennifer A.* (2002)103 Cal.App.4th 692, 705 [127 Cal.Rptr.2d 54].) It is also likely Lucille had information about Lillian. However, the initial appellate record contains no evidence the social worker attempted to gather information from Lucille. Because the notices contained no information about Lillian or Lucille, the tribes could not conduct a meaningful search with the information provided. (See, e.g., *In re Jennifer A., supra,* 103 Cal.App.4th at p. 705; see also *In re D.T., supra,* 113 Cal.App.4th at p. 1455.) The court erred in determining the notice provisions of ICWA had been satisfied.

## C

 The Agency concedes the initial appellate record does not show that the ICWA notice requirements were satisfied. However, it urges us to affirm because it contends the error was cured with the notices sent to the BIA

---

[4] The State of California Health and Welfare Agency and the Department of Social Services have issued two forms to comply with the notice provisions of the ICWA. (*In re Jeffrey A.* (2002) 103 Cal.App.4th 1103, 1108 [127 Cal.Rptr.2d 314].) The forms are entitled " 'Request for Confirmation of Child's Status as Indian' (form 'SOC 318') and 'Notice of Involuntary Child Custody Proceedings Involving an Indian Child' (form 'SOC 319')." (*Ibid.*)

and the recognized Cherokee tribes in August 2002, which are part of the augmented appellate record.[5] We may conclude the inadequate initial ICWA notice is harmless if the August 2002 notices sent by the Agency comply with the ICWA. (*In re C.D., supra*, 110 Cal.App.4th at pp. 224, 226–227.)

The augmented record shows the social worker provided the BIA, the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the Cherokee Nation of Oklahoma with Lucille's name, birthdate, and birthplace, the name of S.'s paternal grandfather, and the names, birthdates, and states of birth for S.'s paternal great-grandparents. However, the August 2002 notices still do not comply with the requirements of 25 Code of Federal Regulations part 23.11. They did not include T.'s aliases, the birthdate and birthplace of the paternal grandfather, the birthplace of S.'s paternal great-grandparents, the places of death if any relatives are deceased, or any current or former addresses. It is also not clear whether each woman's married or maiden name was provided. The social worker did not say this information is unavailable. The social worker was required to investigate whether this information was available (*In re C.D., supra*, 110 Cal.App.4th at p. 225), or report no family member knew the information required by 25 Code of Federal Regulations part 23.11.

Further, S.'s paternal great-grandfather's date of birth is identified as "12-31-88." We question whether that date is accurate. It is plain that he

---

[5] ▮ We have granted the Agency's request to augment the record with notices sent by the social worker to the BIA and the recognized Cherokee tribes in August 2002 and the signed return receipt cards received by the Agency. We have also granted Lucille's request to augment the record with letters sent by the Cherokee Nation of Oklahoma to the social worker in August 2002 and August 2003. We recognize the Supreme Court has stated postjudgment evidence may not, except in extraordinary circumstances, be used as a basis to reverse a termination of parental rights on appeal. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541].) However, *In re Zeth S.* did not bar postjudgment evidence; it stated an appellate court could consider such evidence in extraordinary circumstances. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 866 [11 Cal.Rptr.3d 1].) In *Alicia B.*, this court held it was appropriate to augment the record with the ICWA notices sent by the Agency because the evidence is not new and denying the motion would be counterproductive to the strong public policy of expeditiously resolving a minor's issues on appeal. (*Alicia B.*, at p. 867.) We recognize no party had an opportunity to challenge the sufficiency of the notices before the juvenile court and agree all parties and the courts would be better served if the adequacy of the notices were litigated before the trier of fact in the first instance. However, it is important to augment the record here to address the deficiencies in the notices, to avoid further appellate intervention following remand. (See *In re Louis S.* (2004) 117 Cal.App.4th 622, 630, fn. 4 [12 Cal.Rptr.3d 110].)

could not have been born in 1988, and it is not clear that he was born in 1888. This question underscores the importance of filing the notices with the juvenile court. Had the notices been properly filed in the first instance, this question could have been addressed and resolved below. Because the notices were incomplete, the tribes and the BIA could not conduct a meaningful search. (See, e.g., *In re Jennifer A.*, *supra*, 103 Cal.App.4th at p. 705.)

In addition, in August 2002 the Cherokee Nation of Oklahoma asked for additional information about the maternal grandparents and the paternal grandfather, "[i]n order to verify Cherokee heritage." The Cherokee Nation of Oklahoma also requested "dates of birth for everyone and maiden names of all females. It is impossible to validate or invalidate this claim without more complete family information." One year later, having received no response to its first letter, the Cherokee Nation of Oklahoma sent another letter to the Agency, stating the tribe "notified [the social worker] that it was impossible to validate or invalidate any claim to Cherokee heritage without more complete family information. Our notice explained exactly what type of information was needed and asked [the social worker] to diligently research, to the best of [her] ability, and supply as much as possible." The social worker, however, did not respond to this letter. The Agency has not provided an explanation for not responding to these requests for information other than conjecture at oral argument that the letters were incorrectly filed.

■ We are troubled that the Agency did not file these letters with the juvenile court or seek to augment our record with them. The Agency is required to file with the trial court all responses it receives from any tribes. (*In re Karla C.*, *supra*, 113 Cal.App.4th at pp. 175–176, 178; *In re H.A.* (2002) 103 Cal.App.4th 1206, 1214–1215 [128 Cal.Rptr.2d 12].) Not filing the tribes' responses aids neither the courts nor the parties and does not serve the purpose of the ICWA. We infer from these letters that the Cherokee Nation of Oklahoma may believe S. has Indian heritage. If, after remand, the Cherokee Nation of Oklahoma determines she does and chooses to intervene, the Agency's failure to provide sufficient information in a timely fashion will have unnecessarily delayed resolution of this proceeding. The purpose of the ICWA is to promote the stability and security of Indian tribes. (25 U.S.C. § 1902.) That security is not promoted when the Agency does not respond to a tribe's request for information. The court's error of finding the ICWA did not apply in this proceeding was not cured by information contained in the Agency's augmentation of the record.

D

Ray and Lucille also argue the matter should be reversed because (1) S.'s birth certificate and a copy of the dependency petition were not sent with the notice; (2) S.'s full name was not provided; (3) the notices were not sent by certified mail; and (4) there is no evidence the BIA or the Cherokee Nation of Oklahoma received notice because the Agency did not file proofs of service. We need not address these arguments, because other grounds exist for reversal. However, we urge the Agency to comply with the provisions of the ICWA when it provides notice following remand.

We reluctantly remand this matter to the juvenile court for the second time, particularly because this reversal was entirely preventable. By the time this opinion is filed, S. will have been in the juvenile system for over three years. However, given the deficiencies in compliance with the notice provisions of the ICWA, we have no alternative but to reverse the matter for proper notice to be provided to the tribes and the BIA.[6]

II

Ray asserts the court abused its discretion by denying his section 388 modification petition seeking to vacate the referral to the section 366.26 hearing and to obtain six months of services. Under section 388, a parent may petition the court to change, modify, or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence, and the proposed modification is in the minor's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)

"The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citations.]" (*In re Jasmon O., supra,* 8 Cal.4th at p. 415.) " ' ["]The appropriate test for abuse of discretion is whether the trial court

---

[6] However, we do not require that all orders in the matter be reversed if S. is found to be an Indian child. Although Ray relies on *In re Amirah H.* ▮ for that proposition, that case has been depublished and is not citable as authority.

exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

Because the Agency conceded,[7] and the court accepted, that Ray's circumstances had changed, we address only whether the court abused its discretion in determining that because Ray had no relationship with her, it was not in S.'s best interests to grant the petition. In examining that finding, we consider the bond between Ray and S. and the bond between S. and her current caretakers. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531 [65 Cal.Rptr.2d 495].)

The social worker believed S. considered Ray a stranger. She did not want to visit with him and was anxious about being alone with him. During visits, she rejected his attempts to show affection. When he attempted to talk to, hold, or kiss her, she turned her head away, said "stop it," ran away, or cried. When he asked her for something or tried to engage her, she said "no stop," "I don't want to," or "no, no," or tried to hit him, pushed him away, or turned her head away. She tried to close the door to the visitation room to prevent his entry. She did not ask about him between visits or talk about his visits after they were completed.

In contrast, S. saw her foster parents as parents. She relied on them to meet her needs and was "clearly bonded" to them. She felt secure and comfortable with them.

Further, Ray did not act in a parental manner. He did not come prepared for visits with food or diapers, did not call S. on her birthday or give her a gift, or call the foster parents between visits. He did not regularly visit. Between April and September 2001, he visited S. only three times. He did not contact the social worker for visits or to check on S.'s well-being between

---

[7] The Agency attempted to withdraw its concession that Ray's circumstances had changed, but the court did not allow the Agency to do so because of the earlier stipulation.

November 2002 and May 2003. He requested visits in May 2003, but either did not attend or was often late to the visits she arranged. He apparently did not visit S. between July 3 and September 10, 2003.[8] He also acted inappropriately. While waiting in the court hallway to testify at the section 366.26 hearing, the foster mother saw Ray hit T. in the face with his fist.

Relying on *In re Kimberly F., supra*, 56 Cal.App.4th 519, Ray asserts we should find the court abused its discretion because it did not focus on the benefit S. would gain from continuing her relationship with Lucille and other parental relatives, which would occur if Ray received services. However, *In re Kimberly F.* stated that the "simple best interest test" ignored the bonds between a father, a mother, a sister, and a brother, and devalued the minor's interests in preserving an existing family unit. (*Id.* at pp. 529–530.) It does not stand for the proposition that the court had to consider the minor's relationship with extended family members.

There is no dispute S. had a bond with Lucille; however, " '[f]amily preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability.' " (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195 [80 Cal.Rptr.2d 887].) Accordingly, the court had no reason to focus on S.'s relationship with Lucille or other parental relatives. The social worker believed terminating parental rights was in S.'s best interests because she did not have a relationship with Ray. Ray introduced no contrary expert evidence or any evidence S. would be harmed if her relationship with Lucille or other parental relatives ended. The court did not abuse its discretion in denying Ray's section 388 modification petition.

III

Ray asserts the judgment must be reversed because the trial court did not ensure S. visited her half brother J., which limited his ability to argue that the

---

[8] Although Ray testified he attempted to obtain more visits with S., the court found him to be not credible, a determination we do not reweigh. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [82 Cal.Rptr.2d 426].)

sibling relationship exception of section 366.26, subdivision (c)(1)(E) applied.[9]

Ray correctly asserts the Legislature has recognized the importance of sibling relationships. (See, e.g., §§ 366.26, subd. (c)(1)(E), 16002.) However, in enacting section 366.26, subdivision (c)(1)(E), "the [L]egislature was concerned with preserving long-standing relationships between siblings [that] serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404 [127 Cal.Rptr.2d 922]; see also § 16002, subd. (a) ["It is the intent of the Legislature to maintain the continuity of the family unit, and ensure the preservation and strengthening of the child's family ties by ensuring that when siblings have been removed from their home, . . . the siblings will be placed in foster care together . . ."].) The Legislature wanted to protect sibling relationships because they become even more important after children have lost their homes, parents, schools, and friends. (*In re Erik P., supra,* 104 Cal.App.4th at p. 404.) " ' "Siblings are the only family, the last link to normalcy, that these children have left." ' " (*Ibid.*)

 S. and J., however, do not have a "long-standing relationship." S. was removed from T.'s custody at birth. J., who is not T.'s child, has lived with S. for, at most, one month.[10] The social worker was unaware S. had any relationship with J. These facts show the court need not have ordered sibling visitation because there was no relationship of the type the Legislature seeks to protect. Ray has cited no authority that requires the Agency to develop a relationship between siblings that did not exist at the time a juveniledependency petition was filed. Although Ray implies section 16002 places a duty on the Agency to ensure sibling visits occur, this section does so only in the

---

[9] The Agency asserts Ray has waived his right to argue about alleged deficiencies in sibling visitation by not bringing a writ petition under rule 39.1B or appealing from earlier proceedings. Because Ray is not arguing about sibling visitation for any time period prior to the referral hearing, there is no waiver for not timely appealing earlier rulings. The Agency also asserts Ray has waived his right to raise the issue here because he did not raise the issue in the juvenile court. Although the Agency is correct that Ray did not raise the issue of sibling visitation, it came before the juvenile court in the context of Lucille's section 388 modification petition. We apply the waiver doctrine when a party complains on appeal about an action the court could have corrected had the issue been raised below. (See *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060 [120 Cal.Rptr.2d 687].) Because the juvenile court here had the opportunity to address the issue of sibling visitation, there is no waiver.

[10] Lucille implied J. lived with her for most of the six months S. was also living with her. However, J. disagreed and the court found him to be more a credible witness than Lucille. We may not reweigh that credibility determination. (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52–53.)

context of both siblings having been removed from parental custody (§ 16002, subd. (b)), which was not the case here.

We contrast the relationship between S. and J. with the parent and minors in the case relied on by Ray, *In re David D.* (1994) 28 Cal.App.4th 941 [33 Cal.Rptr.2d 861]. There, the juvenile court suspended the mother's visitation with her children until she provided the court with her medical records. We contrast the relationship between S. and J. with the parent and minors in the case relied on by Ray, *In re David D.* (1994) 28 Cal.App.4th 941 [33 Cal.Rptr.2d 861]. There, the juvenile court suspended the mother's visitation with her children until she provided the court with her medical records. (*Id.* at p. 945.) The appellate court determined the visitation suspension was erroneous because suspending visits was not in the minors' best interests. (*Id.* at p. 953.) The court was also concerned because depriving the mother of visits eliminated her ability to meet the first prong of the section 366.26, subdivision (c)(1)(A) exception even though there was "overwhelming" evidence of the minors' bond with their mother. (*David D.*, at p. 955.) Here, there was no evidence S. had any bond with J. Although we recognize that visitation is an essential component of maintaining a bond between siblings and limiting visits might impact the parent's ability to establish the section 366.26, subdivision (c)(1)(E) exception to termination of parental rights, there is no requirement to provide visitation to create a bond that does not exist.

Further, it appears the court did not have jurisdiction over J. to order visits. J. was not a dependent. It is not apparent Ray had legal custody of J. to enable the court to order Ray to facilitate visitation. Without having jurisdiction over J., the court could not order visits.[11] Ray has not demonstrated reversible error.

## DISPOSITION

The judgment terminating parental rights is reversed. The court is directed to ensure that proper notice is given under the ICWA. If, after receiving notice, no tribe intervenes, the juvenile court shall reinstate the judgment. (See *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 261 [126 Cal.Rptr.2d 639].)

Benke, Acting P. J., and Aaron, J., concurred.

---

[11] In any event, it appears S. saw J. "often enough," from which we infer visits occurred.